KROEGER, Appellee,

v.

RYDER, Admr., Appellant.

[Cite as *Kroeger v. Ryder* (1993), 86 Ohio App.3d 438.]

Court of Appeals of Ohio,
Ottawa County.

No. 92–OT–001.

Decided Feb. 19, 1993.

*John Brikmanis,* for appellee.

*David Bender,* for appellant.

---

ABOOD, Judge.

This is an appeal from a judgment of the Ottawa County Court of Common Pleas, which, following a trial to the court, awarded $32,400 to plaintiff-appellee, Lois Kroeger, for personal care and services that she provided to her deceased brother, Clyde E. Ryder, during his last illness.

Defendant-appellant, David A. Ryder, Administrator WWA of the estate of Clyde E. Ryder, sets forth three assignments of error:

1. "Where defendant filed a timely request for findings of fact and conclusions of law following the court's filing of its decision, it is error by the trial court not to issue written findings of fact and conclusions of law."

2. "It was error by the trial court to apply the burden of proof of a preponderance of the evidence instead of clear and convincing evidence.".

3. "Where the evidence does not establish a contractual relationship between the parties, or establish unjust enrichment in the amount of the prayer, it is error for the trial court to hold against the manifest weight of the evidence that plaintiff is entitled to the entire amount of plaintiff's prayer is error [*sic*]."

This case arises out of appellant's rejection of appellee's claim against the estate for services she provided to the decedent from March 15, 1987 until his death on June 16, 1989. The facts will be set forth as they become relevant to a determination of the issues raised herein.

## I

The following facts are relevant to a determination of appellant's first assignment of error. After appellant rejected appellee's claim for services, appellee filed a complaint in the Ottawa County Court of Common Pleas, which alleged " * * * that she is entitled to payment on the basis of contract implied in fact or, in the alternative, part performance of contract * * *, oral contract * * *, implied contract or * * * quantum meruit," and demanded judgment in the amount of $32,400. On September 10, 1991, the case was tried to the court which, on November 8, 1991, filed a written "decision" that set forth, in pertinent part, the following findings:

"The care provided to decedent from the period of March 15, 1987 to June 16, 1989 was complete, comprehensive and competent. Decedent promised to pay plaintiff for such services but died before he was able to effect payment. Decedent provided plaintiff with an opportunity to 'draw down' his checking and savings accounts in satisfaction of his promise to pay, but plaintiff declined on grounds of propriety. The burden of proof required of plaintiff upon her complaint is by a preponderance of the evidence and in satisfaction of that burden established damages well in excess of her prayer of $32,400. However, plaintiff is limited to recovering the amount claimed in the complaint, and judgment will be granted accordingly, with interest and costs."

The court instructed appellee's attorney to prepare a judgment entry and continued the case. On November 15, 1991, appellant filed a "request for findings of fact and conclusions of law" pursuant to Civ.R. 52. On December 4, 1991, the trial court successively filed three separate documents entitled "judgment entry," which, in order of filing, provided: (1) that appellee is to file proposed findings of fact and conclusions of law no later than December 11, 1991; (2) that attorneys for both parties "have approved and presented to the Court a final judgment entry which, when signed by the Judge and filed with the Clerk would obviate the necessity for written findings and conclusions by the Court. In any event, the Court's decision of November 8, 1991 sufficiently states findings and conclusions & satisfies the requirements of Civ.R. 52"; and (3) that judgment is rendered in favor of appellee in the amount of $32,400.

Appellant's first assignment of error is directed at the second of the above judgment entries that were filed by the trial court on December 4, 1991. In support thereof, appellant argues that the trial court's duty under Civ.R. 52, to state in writing its conclusions of fact and law upon a timely written request, is mandatory and that, although this duty can be satisfied by the previous filing of a written decision, the trial court's November 8, 1991 "decision" did not comply with Civ.R. 52 because it did not state "any basis whatsoever as to how it arrived at the value of those services." Appellant also claims that it cannot be deter-

mined from the trial court's "decision" which theory of recovery appellee was permitted to recover under.

Appellee responds that, by approving the third judgment entry of December 4, 1991, appellant "was no longer interested in the previously requested findings and conclusions by the trial court"; and that, even if the trial court was still obligated to state in writing its conclusions of law and fact, its previously issued "decision" sufficiently complies with the requirements of Civ.R. 52.

Appellant replies that the approval of a judgment entry "merely indicates that the Judgment Entry states what the Judge indicated it should state," and does not indicate a waiver of rights under Civ.R. 52.

The issue that is determinative of appellant's first assignment of error is whether the trial court's decision of November 8, 1991 set forth findings of fact and conclusions of law that are sufficient to satisfy the requirements of Civ.R. 52.

Civ.R. 52 provides, in pertinent part, that:

"An opinion or memorandum of decision filed in the action prior to judgment entry and containing findings of fact and conclusions of law stated separately shall be sufficient to satisfy the requirements of this rule and Rule 41(B)(2)."

The purpose of Civ.R. 52 is " 'to aid the appellate court in reviewing the record and determining the validity of the basis of the trial court's judgment.' " *In re Adoption of Gibson* (1986), 23 Ohio St.3d 170, 172, 23 OBR 336, 337, 492 N.E.2d 146, 147, quoting *Werden v. Crawford* (1982), 70 Ohio St.2d 122, 124, 24 O.O.3d 196, 197–198, 435 N.E.2d 424, 426.

In light of its purpose, no precise rule has been or should be set forth as to what is required of the trial court in order to comply with Civ.R. 52. Generally, however, the findings and conclusions must articulate an adequate basis upon which a party can mount a challenge to, and the appellate court can make a determination as to the propriety of, resolved disputed issues of fact and the trial court's application of the law. *Stone v. Davis* (1981), 66 Ohio St.2d 74, 85, 20 O.O.3d 64, 71, 419 N.E.2d 1094, 1101; *In re Schoeppner* (1976), 46 Ohio St.2d 21, 23, 75 O.O.2d 12, 13, 345 N.E.2d 608, 609–610; *Stephan's Machine & Tool v. D & H Machinery Consultants* (1979), 65 Ohio App.2d 197, 200, 19 O.O.3d 155, 157, 417 N.E.2d 579, 582; *St. Paul Fire & Marine Ins. Co. v. Battle* (1975), 44 Ohio App.2d 261, 267, 73 O.O.2d 291, 294, 337 N.E.2d 806, 812.

Since in this case appellant disputes both, we must, under this assignment of error, determine whether the trial court's findings sufficiently enable a challenge to, and determination of the validity of the basis for, the judgment as to both liability and damages.

As to liability, appellant alleges that appellee is not entitled to recover under any of the theories advanced in her complaint. Therefore, in order to comply with Civ.R. 52, the trial court's decision must set forth the theory upon which it permitted appellee to recover. The trial court's "decision" set forth its finding that "[d]ecedent promised to pay plaintiff for [her] services * * *." Clearly, the trial court found appellee entitled to recover on the basis of an express oral contract.

As to the issue of damages, appellant raises three defenses: (1) there were time "gaps" in the care provided by appellee to the decedent due to a period during which decedent was hospitalized and periods during which other persons cared for him, for which appellee should not be compensated; (2) decedent made payments to appellee before he died and while he was ill, and these payments fully or partially compensated her for her service; and (3) the monetary value of appellee's service to the decedent is less than the $8.50 per hour testified to by her expert and should rather be set at either $7.50 or $6.09 per hour, or $500 per month, as testified to by other witnesses.

As to appellant's time-gap defense, the trial court's "decision" states that the care provided by appellee to the decedent "from the period of March 15, 1987 to June 16, 1989 was complete, comprehensive and competent." It is clear that the trial court resolved this defense in favor of appellee. As to appellant's defense that the decedent already compensated appellee for her service, the trial court's statement that decedent "died before he was able to effect payment" indicates that it also resolved this defense in favor of appellee.

As to the monetary value of appellee's service to decedent, although the trial court's "decision" omitted reference to how it resolved this issue, "when considered together with other parts of the trial court's record, it formed an adequate base upon which to decide the narrow legal issue presented." *Stone, supra,* 66 Ohio St.2d at 85, 20 O.O.3d at 71, 419 N.E.2d at 1101. The trial court found appellee's service to be comprehensive between March 15, 1987 and June 16, 1989. Since appellee's testimony that she averaged 5.5 hours per day in providing care to decedent is undisputed, and since the trial court found that appellee "established damages well in excess of her prayer for $32,400," the court necessarily determined that the value of appellee's services is either $7.50 per hour or $8.50 per hour.[1] Even without the more specific formulation, the trial

---

1. The period from March 15, 1987 to June 16, 1989 is twenty-seven months. Twenty-seven months times 5.5 hours per day times thirty days per month equal 4,455 hours. In order to arrive at a figure in excess of the prayer for $32,400, we would have to multiply 4,455 hours by Y, Y being the value of appellee's services. If Y were to equal $6.09 per hour or $500 per month, the sum would fall below the prayer for $32,400 ($27,130.95 in the case of $6.09 per hour or $13,500 in the case of $500 per month). If, however, Y were to equal $8.50 or $7.50,

court's finding that appellee established damages in excess of $32,400 is sufficient to permit a challenge thereto and a determination of the propriety thereof.

Upon consideration of the foregoing, this court finds that the trial court's "decision" filed November 8, 1991 contained findings of fact and conclusions of law sufficient to satisfy the requirement of Civ.R. 52.

Accordingly, appellant's first assignment of error is not well taken.

## II

Appellant's second assignment of error is directed at the trial court's finding that "[t]he burden of proof required of plaintiff upon her complaint is by a preponderance of the evidence * * *." Appellant argues that "when the plaintiff seeks recovery for services rendered to a decedent with whom she occupied a family relationship and a fiduciary relationship, the correct burden of proof is clear and convincing evidence * * *." In support of his argument appellant relies solely upon the case of *Harding v. Talbott* (1936), 57 Ohio App. 21, 8 O.O. 175, 11 N.E.2d ·266.

Appellee responds (1) that "the family relationship rule was solely applicable to family members. Family members were defined as those interdependent members living under one roof"; and (2) that there is no evidence of a fiduciary relationship in this case.

This court finds preliminarily that *Harding v. Talbott, supra,* does not elevate the rendering of personal care to the status of a fiduciary undertaking. Rather, *Harding* simply applies the "family member" rule to a non-blood relative who was living in a family relationship with the decedent.

The sole issue that is determinative of appellant's second assignment of error is whether the "family member" rule applies in this case.

The "family member" rule, as originally set forth by the Supreme Court of Ohio in *Hinkle v. Sage* (1902), 67 Ohio St. 256, 65 N.E. 999, at the syllabus, provides that:

"1. In an action to recover compensation for services, when it appears that the plaintiff was a member of the family of the person for whom the services were rendered, no obligation to pay for the services will be implied; and the plaintiff cannot recover in such case unless it be established that there was an express contract upon the one side to perform the services for compensation, and upon the other side to accept the services and pay for them.

---

the sum would be in excess of the prayer for $32,400 ($37,867.50 in the case of $8.50 per hour and $33,412.50 in the case of $7.50 per hour).

"2. Such contract may be in writing or it may rest entirely in parol, and it may be proved by direct or indirect evidence; but to entitle the plaintiff to recover, the contract must be established by clear and unequivocal proof."

Later, in *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493, paragraph two of the syllabus, the Supreme Court of Ohio modified the rule as stated in the second paragraph of the *Hinkle* syllabus to "clear and *convincing* proof." (Emphasis added.)

■ Under the "family member" rule, the general inference or presumption that the rendering of services brings forth an obligation to pay compensation is replaced by the inference or presumption that the rendering of services between family members is gratuitous. The rationale that this shift grows out of is that, between family members there will be (1) a mutuality of benefits and interdependence, and (2) reciprocal kindness. *Merrick, supra,* 91 Ohio St. at 263, 110 N.E. at 495; Annotation (1949), 7 A.L.R.2d 8, 12, Section 1.

For purposes of the rule, family membership is generally not defined or circumscribed by blood relationship but, rather, by household residence. *Lemunyon v. Newcomb* (1929), 120 Ohio St. 55, 57, 165 N.E. 533, 534; *Hinkle, supra,* 67 Ohio St. at 261–262, 65 N.E. at 1000–1001; *Hoel v. Cook* (App.1935), 20 Ohio Law Abs. 375, 377; 66 American Jurisprudence 2d (1973) 975 and 978, Restitution and Implied Contracts, Sections 30 and 32. Although some cases have held that the relationship of *parent and child* is so close as to destroy any presumption that services rendered by the one to the other were to be paid for, whether they reside in the same household or not, see, *e.g., Sokolowski v. Lucey* (Ohio App.1941), 47 N.E.2d 627, 630; *Woods v. Fifth–Third Union Trust Co.* (1936), 54 Ohio App. 303, 305, 7 O.O. 210, 211, 6 N.E.2d 987, 988; 66 American Jurisprudence 2d, *supra,* at 989, Section 46; Annotation, 7 A.L.R.2d, *supra,* at 88, Section 31, the vast majority of cases hold that any relationship more remote than parent and child, including the relationship of brothers and/or sisters, will not destroy the presumption of payment for services rendered unless the related parties were living together in the same household as members of the same family while the services were rendered. *Corbin v. Bort* (App.1941), 33 Ohio Law Abs. 487, 489, 35 N.E.2d 984, 986; *Hoel, supra,* 20 Ohio Law Abs. at 377; *Price v. Taylor* (App.1932), 12 Ohio Law Abs. 621, 625–626; *Marshall v. Vollrath* (App.1925), 3 Ohio Law Abs. 258; *Thompson v. Jones* (1910), 13 Ohio C.C. (N.S.) 493, 494, 23 Ohio C.D. 182, 183; 18 Ohio Jurisprudence 3d (1980) 253, Contracts, Section 328; 66 American Jurisprudence 2d, *supra,* 999, Section 53; Annotation, 7 A.L.R.2d, *supra,* at 103, Section 35.

■ Where there was no such a family relationship between a plaintiff and a decedent while the latter was living, the general rule in civil cases prevails and

the claim of the existence of a contract to pay for the services provided must be established by a preponderance of the evidence. *Schieve v. Silver* (App.1947), 49 Ohio Law Abs. 123, 125, 75 N.E.2d 104, 104; *Corbin, supra,* 33 Ohio Law Abs. at 489, 35 N.E.2d at 986; *Price, supra,* 12 Ohio Law Abs. at 625; *Marshall, supra,* 3 Ohio Law Abs. at 259; *Pelzer v. Wooley* (1922), 16 Ohio App. 328, 329–330.[2]

This court has reviewed the entire record of proceedings before the trial court. It is undisputed that appellee and decedent were sister and brother and that they were not living together at any time between March 15, 1987 and June 16, 1989. Additionally, there is no evidence of interdependence or mutuality of benefits between them. Upon consideration of the evidence that was before the trial court and the law as set forth above, this court finds that under the family member rule, appellee did not occupy a family relationship with the decedent while she provided services to him and the trial court did not err in finding that "[t]he burden of proof required of plaintiff upon her complaint is by a preponderance of the evidence * * *."

Accordingly, appellant's second assignment of error is not well taken.

### III

The facts that are relevant to a determination of the issues raised by appellant's third assignment of error are as follows. Appellant testified that Clyde was her brother and that she lived three doors down from him. Around March 14, 1987, Clyde became very ill and could hardly get around and, on March 17, 1987, he was admitted to the hospital where he remained until he was released on April 4, 1987. While appellee was visiting her brother at the hospital, he told her that he could no longer afford to stay there and that he was going home or else he would have to go to a nursing home. Appellant testified that he then told her that "I don't want to go to a nursing home so I made arrangements. * * * Lois, you are not doing this for nothing. I want you paid and I will pay you well, but I don't want to go to a nursing home." She responded that "we will see what we can do." She then began to take care of Clyde at his home doing washing, cooking, emptying urinals, taking care of his medication, washing dishes, doing

---

**2.** There are some cases that intimate that a relative claiming compensation from the estate of a decedent for services rendered must establish his case by clear and convincing proof, even where the decedent and claimant were not members of the same family. *In re Merrick* (P.C.1955), 72 Ohio Law Abs. 205, 207, 133 N.E.2d 919, 920; *Bemis v. Bemis* (1948), 83 Ohio App. 95, 100, 38 O.O. 197, 199, 82 N.E.2d 757, 759–760. Appellant, however, has not raised this issue, but has directed his argument entirely at the existence of a family or other special relationship obtaining between appellee and decedent. The rule established in *Hinkle* and *Merrick* applies to family members, not to relatives in general. The increased quantum of proof under these cases is merely one aspect of the family member rule and rises or falls along with it.

laundry, changing his bed, giving him a daily bath and many other services. During the first few months, appellee's foster sister, Inez Smith, stayed with Clyde but she became ill and, during the next month or so, Bob Floro, Clyde's cousin, stayed nights with Clyde. On an average, appellee spent five to six hours per day providing services to Clyde at his house, which time did not include the errands that she ran for him. She also testified that Clyde gave her $500 or $600 a month for expenses, but repeated that he wanted her "to be paid and I want you to be paid well. I want you taken care of." She stated that he also said "Lois, you know what, if I get sick and have to go to the hospital, I want you to write a check and clear my savings and my checking account." She declined, however, because "I didn't think it was a proper thing for me to do and I knew there would be a lot of trouble if I did." She also testified that "three times he gave me money and over the period of 27 months, he gave me $4,000, and when he gave it to me, he said, 'Lois, this is not your pay.' He said, 'This is a bonus. This is an extra gift.' "

On cross-examination, she testified that between March 14, 1987 and April 4, 1987 she took care of Clyde and that, during his hospital stay, she looked for and purchased a hospital bed for Clyde to use upon his return, got "the house ready for him to come home," shopped for groceries, and cleaned and prepared a place for Inez Smith to stay. When her brother came home from the hospital, she attended to all of his personal needs and did Inez's laundry, but Inez did the cooking for Clyde. She also stated that she kept no account of expenses but that she always "settled up" with Clyde at the end of the month; that there were times when she received money in excess of the $500 to $600 per month for expenses, but all expense money was spent on Clyde and Clyde told her that the additional payments were bonuses or gifts; and that Clyde did not specify a dollar amount that he was going to pay her for her services. She also testified as follows:

"Q. Okay. Ma'am, if Clyde hadn't told you what he originally told you that he wanted you to help him, that he wanted to pay you, would you have helped him anyhow?

"A. That is kind of a hard question to answer because I didn't have to—I didn't have to think about that because from the start he told me, 'I am going to pay you and pay you well.'

"Q. Ma'am, I am asking you now though would you have done it anyway?

"A. I wouldn't have let him lay without care. I wouldn't have let him lay hungry. I wouldn't have turned my back on him."

On redirect examination, appellee testified that "I relied on his promise to take care of me the same as he was relying on me to take care of him."

Audrey Mellerk testified that she had known Clyde since December 1981; that they "had gone together"; that appellee "did everything he [Clyde] needed"; that "[s]he [appellee] ran the household"; that Clyde told her that appellee "is going to be well taken care of. If she didn't take care of me, I would have to go to a nursing home and I don't want to go there"; that "she [appellee] knows what she is supposed to do"; that Clyde told her that he told appellee "if something happens, you go to the bank, take the money out of the savings account and the checking account before you tell anybody"; and that she told Clyde not to make appellee do that, but to change his will instead. She further testified that the relationship between Clyde and appellant, who is Clyde's son, "wasn't too close" and that appellant did not visit very often.

Alice Miller testified that she knew Clyde for thirty-five years; that appellee "took very good care of him" while he was ill; that she told Clyde that he would "never get the care if you were in a nursing home like that" and Clyde would respond that "I am going to pay her. I will take care of her well"; that Clyde told her all the things that appellee was doing for him; and that Clyde never said that he "did" take care of appellee, but always said that "I am going to. It will be taken care of." On cross-examination, she testified that she was not aware that within six weeks of Clyde's death, Clyde had appellee make out four checks for herself.

John Moore testified as to his qualifications in nursing home administration and was qualified as an expert witness. He testified further that the value of home health care services between March 15, 1987 and June 16, 1989 was between $8 and $9 per hour and that, based on Clyde's condition during that time, spending five or six hours per day in caring for him was not unreasonable. On cross-examination, he testified that the valuation of $8 or $9 per hour is based on services rendered by someone who is trained in a nursing home and that it is possible that someone not so trained would receive a lower rate.

Nancy Thompson testified that she is a licensed practical nurse; that she knew Clyde for approximately eleven years; and that she would occasionally take care of Clyde to give appellee a break. She also described the things that she did for Clyde and stated that appellee did all those things and other things, too numerous to list here. She stated that he didn't want to go to a nursing home "because they would have rules * * * and he much preferred doing things his way"; that she heard him tell appellee that he will take care of her; that appellee was given money at the beginning of each month which she used to buy "groceries and the salt and many, many things out of it"; and that appellee paid her out of that money. She described the quality of care given Clyde by appellee as "excellent. * * * He wouldn't have gotten that good of care if he would have gone to a nursing home." On cross-examination, she testified that she was paid

"around $7.50 [per hour]" for her services to Clyde and on redirect examination, testified that she would spend between forty and fifty hours every two weeks caring for him. (In appellee's statement of accounting and expenditures attached to the claim made against the estate, Nancy Thompson's wage was listed as $6.09 per hour.)

Appellant testified that appellee told him that Clyde had credited Inez Smith $500 on a $2,000 loan for the time she spent taking care of him.

■ Appellant's third assignment of error in relevant part[3] is directed at the trial court's findings that "[t]he care provided to decedent from the period March 15, 1987 to June 16, 1989 was complete, comprehensive and competent"; that "[d]ecedent promised to pay plaintiff for [her] services * * *"; and that appellee "established damages * * * in excess of her prayer of $32,400." In support, he argues that the manifest weight of the evidence "clearly shows that there could not have been a meeting of the minds regarding the amount of compensation for any alleged oral contract between the decedent and Lois Kroeger. * * * [I]t would be much more consistent to believe that decedent believed he had compensated Lois Kroeger for her services * * * by his payment to her of $500 to $600 per month (and some months well in excess of that) and * * * when he gave her the additional payments * * *." He also argues that the weight of the evidence manifestly establishes that there were gaps in appellee's care of decedent when Smith, Floro and Thompson cared for him and that her services were worth less than $8 or $9 per hour.

As to an appellate court's review of a trial court's judgment as being against the manifest weight of the evidence, the Supreme Court of Ohio, in *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 409–410, 461 N.E.2d 1273, 1276, explained as follows:

"While we agree with the proposition that in some instances an appellate court is duty-bound to exercise the limited prerogative of reversing a judgment as being against the manifest weight of the evidence in a proper case, it is also important that in doing so a court of appeals be guided by a presumption that the findings of the trier-of-fact were indeed correct.

"The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. The inter-

---

3. Appellant argues as well that there is insufficient evidence to support a finding of implied contract or unjust enrichment. In light of our finding regarding appellant's first assignment of error, that the court's decision is clearly premised on express contract, these other arguments are irrelevant.

play between the presumption of correctness and the ability of an appellate court to reverse a trial court decision based on the manifest weight of the evidence was succinctly set forth in the holding of this court in *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St.2d 279 [8 O.O.3d 261, 376 N.E.2d 578]:

" 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'

"See, also, *Frankenmuth Mut. Ins. Co. v. Selz* (1983), 6 Ohio St.3d 169, 172 [6 OBR 227, 229, 451 N.E.2d 1203, 1205]; *In re Sekulich* (1981), 65 Ohio St.2d 13, 16 [19 O.O.3d 192, 194, 417 N.E.2d 1014, 1016]." (Footnote omitted.)

As to the amount of compensation not being specifically fixed by agreement, in *Weber v. Billman* (1956), 165 Ohio St. 431, 438, 60 O.O. 86, 90, 135 N.E.2d 866, 871, the Supreme Court of Ohio explained as follows:

" * * * [A]mple evidence was presented in this case from which the jury could and apparently did find that plaintiff and decedent entered into a definite oral arrangement whereby she left her own home and went to work for him at his express solicitation and request for as long as she might be needed, and that there was a clear understanding she would be compensated for her services. True, the amount of that compensation was not fixed, but, 'if the contract makes no statement as to the price to be paid, the law invokes the standard of reasonableness, and the fair value of the services is recoverable,' and, 'where labor or materials are furnished by request and no price is agreed on, the law will imply an agreement to pay what they are reasonably worth.' 12 American Jurisprudence, 878, Section 324. Compare 34 Corpus Juris Secundum, 825 *et seq.*, Executors and Administrators, Section 774; 58 American Jurisprudence, 555, Section 55; *Sussdorff v. Schmidt*, 55 N.Y., 319, 324."

As to an allegation that appellee was paid by decedent, "[t]hat is an affirmative defense * * * and the burden rested on defendants to prove it." *Id.*, 165 Ohio St. at 439, 60 O.O. at 90, 135 N.E.2d at 871.

Upon consideration of the entire record of proceedings that was before the trial court including the testimony as summarized above, this court finds that there was some competent, credible evidence to support each of the trial court's findings.

Accordingly, appellant's third assignment of error is not well taken.

On consideration whereof, this court finds that substantial justice was done the party complaining, and the judgment of the Ottawa County Court of Common

Pleas is affirmed.  This court finds further that there are reasonable grounds for this appeal, and costs only are assessed against appellant.

*Judgment affirmed.*

GLASSER, P.J., and SHERCK, J., concur.